UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN R. SAUCEDO,<br><br>                 Petitioner,<br><br>     v.<br><br>P. D. BRAZELTON,<br><br>                 Respondent. | Case No. 13-cv-01696-SI<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**<br><br>Re: Dkt. No. 1 |

## INTRODUCTION

Steven R. Saucedo ("petitioner"), a prisoner at Pleasant Valley State Prison in California, has filed this *pro se* action for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his 2010 conviction in Santa Clara County Superior Court. This matter is now before the Court for consideration of the merits of the petition. For the reasons discussed below, the petition is DENIED.

## BACKGROUND

Following a jury trial, petitioner was convicted of first degree burglary, assault with a deadly weapon or by means of force likely to produce great bodily injury, and assault with a deadly weapon. *People v. Saucedo*, 2011 WL 5356796, at *1 (Cal. Ct. App. Nov. 8, 2011). Several sentence enhancement allegations were found true. *Id.* He was sentenced to 19 years in prison. *Id.* Petitioner was tried in a single proceeding together with codefendants Martell and Samuel. *Id.* at *4. At the end of the trial, Martell pleaded no contest to misdemeanor assault, while Samuel pleaded no contest to assault by means of force likely to produce great bodily injury. *Id.* at *6-7.

The California Court of Appeal summarized the facts of the offense as follows:

> Mauricio and Gabriel Ortiz [FN2] shared an apartment in San Jose. Early in the evening on July 1, 2009, Gabriel, a barber, was cutting Charlie Sanchez's hair while another client, Sanchez's friend Mark Gonzales, waited. Mauricio was watching television. He had consumed "two or three" 24–ounce cans of beer that evening, and had "probably" used methamphetamine the night before.
>
>> FN2. To avoid confusion occasioned by shared surnames, we refer to the Ortiz brothers and to Samuel and Valerie Palacios by their first names. We intend no disrespect.
>
> Dustin Martell, his girlfriend Valerie Palacios, their two small children, and Valerie's brother Samuel Palacios lived in the apartment next door to the Ortizes. Defendant lived nearby and sometimes visited Martell.
>
> Mauricio had rearranged some pictures and "wanted to cover up ... the little nail holes in the wall" with putty. Martell had borrowed the putty a few months before and Mauricio was "a little, you know, bothered that he never returned it back." Around six or seven that evening, Mauricio saw Samuel outside and "confronted" him about the putty. Mauricio "wasn't being a jerk about it or anything," but Samuel responded in a "very aggressive" manner and then "offended" Mauricio "in some way." That caused Mauricio to become a little "impolite," and things went downhill from there. Valerie yelled at Mauricio to stop "talking smack" to her brother. Mauricio told Valerie, "You're drunk." And "she was just ... cursing and yelling at me." Mauricio went back inside. Gabriel "started talking to Valerie, ... trying to fix things ...," but that "just made the situation worse."
>
> Gabriel left to buy cigarettes. About five minutes later, Samuel, Martell, and defendant appeared "side by side" on the threshold of Mauricio's open door. He told them to leave and tried to slam the door on their hands. Unable to close the door because the three outside were "pushing as hard as they could" on it, Mauricio "pulled out the mace" and sprayed them.
>
> According to Mauricio, the three pushed their way inside. "[Samuel] went towards me," Mauricio claimed, "and me and [Samuel] were having a physical altercation." Martell was "[s]winging, kicking." There was "a TV that was on a dresser in the living room," and somebody "dropped the TV on the back of [Mauricio's] head." Mauricio was "hunched down and just fighting" and "like, looking at the floor," so he did not see who threw the television. He believed it was Martell, however, "because I don't think [Samuel] would [have] be[en] able to reach [it]."
>
> Mauricio said defendant was on his left when the television landed on his head, and he was stabbed "[j]ust about the same time." "I was hit with the television first, and then after, I was stabbed." Samuel, defendant, and Martell "were all in the apartment" at the

2

time. Mauricio had seen defendant with his right hand "hiding something" in his pocket when he entered the apartment, and when defendant took his hand out of his pocket as Mauricio "was being beaten," Mauricio saw "an object" in his hand. Mauricio claimed defendant stabbed him during the fight with Samuel. "He sneaked up on me and got me from the side without me looking."

Gonzales witnessed much of the fracas from a couch "[r]ight next to the door" in Mauricio's apartment. Gonzales, who was drinking a 22–ounce Corona, saw Mauricio arguing with "the neighbor lady," who called him a "pervert" and told him "he couldn't handle his alcohol." Mauricio shut the door but opened it again in response to a knock, and Gonzales saw Martell, Samuel, and a "third guy" who was "kind of tall, about 6–foot one," standing there. Samuel was in front of the other two. Mauricio exchanged words with "[o]ne of the guys ... about why [Mauricio] was talking to his wife or his girlfriend that way." All three were arguing with Mauricio, and "[e]verybody was yelling at the same time." When Mauricio tried to close the door, one of the three blocked it with his foot, and Samuel and Martell pushed their way into the apartment. Mauricio said, " 'I got something for you,' and then he busted out a bottle of pepper spray." Samuel "threw the first punch," but Gonzales "could barely see who was throwing what punch" because the pepper spray hit him in both eyes. He saw Mauricio "fall back on the couch."

Gonzales announced that he "wasn't acquainted with any of them, you know," and one of the three men, [FN4] who had remained outside, told him, "Then leave." "And that's when I got up, and I just ran out of the house."

> FN4. Although Gonzales described this person as the "taller of the three of them," he then identified defendant (the "third guy," who was "about 6–foot one") as that person. Martell testified that he is six feet four inches tall. Samuel testified that he is five feet six inches tall. Martell's counsel stated during colloquy outside the presence of the jury that defendant is "five-nine, apparently. I'm getting that information."

About "a minute, two minutes" later, Gonzales saw Sanchez running across the parking lot. One of the men was chasing Sanchez, but his back was to Gonzales, "so I really couldn't make out the face."

Sanchez, who occasionally went to Gabriel's apartment for a haircut when the barbershop was closed, also witnessed the melee. Sanchez consumed "like, one or two" 12–ounce cans of beer that evening. He "heard a girl yelling ... towards [Mauricio's] apartment." The door to the apartment and the curtains on the window were closed, but the window was open. Mauricio closed it. "And then-then, like, I guess someone was at the door." Mauricio opened it, and Sanchez saw Samuel, Martell, and defendant on the doorstep. Gonzales heard Martell say "[s]omething about 'This is the last time.'"

Mauricio tried to shut the door but "someone was pushing it from outside." Sanchez did not see who it was. "The door opened, and then [Mauricio] started wrestling with [Samuel]." Gonzales "didn't

3

really see any punches." "It was more just like somebody rushing towards someone else, and then them falling over and kind of, like, stumbling all around the apartment." Samuel was already inside but the other two were still at the door when Mauricio pulled out the pepper spray, and Sanchez saw Samuel try to move the hand holding it. Sanchez did not get pepper spray in his eyes.

Things happened "fast." One of the two at the door stayed there while the other one came inside "and grabbed an object and slammed it over Mauricio's head." Sanchez did not get a good look at the object, but it "looked like" a television. Sanchez could not recall exactly when the person who threw the television entered the apartment because he was focusing on the person at the door, but "everybody was inside that apartment when it all happened."

Sanchez was focused on the person at the door because that person had a knife in his hand. Sanchez could see two inches of the blade. The tip of the knife "had, like, a hook on it." According to Sanchez, the person who had the knife was not the person who dropped the television on Mauricio's head. "Mauricio's back had hit the couch; and right after that, the TV got down on his head; and then right after that, the knife came out. So the person that had the knife couldn't do both things at the same time." Sanchez said defendant was the person at the door.

Defendant was "[i]nside, by the door," and he asked Sanchez and Gonzales if they were involved. "At the same time he was confronting us, he was taking [the knife] out." Sanchez told defendant, "I'm just here to get a haircut," and defendant told him and Gonzales to leave. As they left, Sanchez saw defendant "go towards Mauricio" with the knife in his hand. Sanchez did not see defendant or anyone stab Mauricio.

Sanchez hurried past Martell, who was standing at the door, "[p]artway in." Martell was not paying attention to Sanchez. "He was more concentrated on what was happening to Mauricio." Sanchez said Martell looked "like, traumatized from what was going on." Sanchez did not agree that Martell had remained outside the entire time. If he had, Sanchez would have seen him behind defendant as defendant pulled out the knife, "[a]nd ... I remember not seeing nobody behind him when he was pulling out the knife." Sanchez explained that there was "enough time in the-in the total time where the knife was pulled out and [defendant] pulled out the knife and went towards Mauricio. The time that I focused on [defendant] walk[ing] over there, that was enough time for [Martell] to go back to the door."

Once outside, Sanchez ran to the right and "then ... I looked back." Sanchez saw defendant, with the knife in his hand, about 21 feet behind him. Defendant chased Sanchez through the parking lot of the apartment complex for 20 or 30 yards. Sanchez got away by jumping a fence into another apartment complex. From the other side of the fence, Sanchez looked back "to see what he was going to do next" and saw defendant getting into the passenger seat of a blue van. The van left the apartment complex, and Sanchez called the police.

4

*Saucedo*, 2011 WL 5356796, at \*1-4 (footnote omitted).

## JURISDICTION AND VENUE

This Court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254.  28 U.S.C. § 1331.  This action is in the proper venue because the challenged conviction occurred in Santa Clara County, California, within this judicial district.  28 U.S.C. §§ 84, 2241(d).

## EXHAUSTION

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court.  *See* 28 U.S.C. § 2254(b)-(c).  The parties do not dispute that the state judicial remedies were exhausted for the claims in the petition, except for petitioner's ineffective assistance of counsel claim based on a failure to investigate.  Docket ("Dkt.") 17-1 at 12.  The unexhausted failure-to-investigate claim is discussed below on pages 13-15.

## STANDARD OF REVIEW

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court

arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412–13 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

# DISCUSSION

## I. Ineffective Assistance of Counsel Claims.

Petitioner claims that defense counsel rendered ineffective assistance when she (a) failed to move to sever petitioner's case from that of his codefendants, and (b) failed to move to reopen the case.

The Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). The benchmark for judging any claim of ineffectiveness is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. *Id.* In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, petitioner must establish two things. First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms. *Strickland*, 466 U.S. at 687-88. Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* A

court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as the result of the alleged deficiencies. *See Strickland*, 466 U.S. at 697; *Williams v. Calderon*, 52 F.3d 1465, 1470 & n.3 (9th Cir. 1995) (applauding district court's refusal to consider whether counsel's conduct was deficient after determining that petitioner could not establish prejudice).

### A. Failure to Move to Sever.

Petitioner and his codefendants pursued a joint defense. *Saucedo*, 2011 WL 5356796, at *7. There was evidence that petitioner, Martell, and Samuel were involved in the fight, and all three were arrested. *Id.* at *4-5. They were charged together but only petitioner was charged with personal use of a deadly or dangerous weapon (a knife). *Id.* at *1, *4.

Petitioner contends that defense counsel's failure to move to sever his case from that of his codefendants was ineffective assistance of counsel. He urges that the motion to sever should have been made because (1) his defense "was clearly inconsistent" with Martell's and Samuel's, because they all agreed that one of them stabbed Mauricio and they all pled not guilty and (2) "strong evidence" against his codefendants would have strengthened his defense. Dkt. 13-1 at 33-34. He further contends that this failure prejudiced him because it prevented his defense counsel from calling exculpatory witnesses to impeach the testimony of his codefendants and the victim. Dkt. 10-1 at 15.

The Santa Clara County Superior Court rejected this claim of ineffective assistance, concluding that binding precedent would not allow a severance under the circumstances:

> Regarding petitioner's assertion that a motion to sever the case should have been made and would have been granted, case law is to the contrary. Indeed, this was a "classic case" for joinder. (*People v. Homick* (2012) 55 Cal.4th 816, 850; *People v. Souza* (2012) 54 Cal.4th 90, 110; *People v. Letner and Tobin* (2012) 50 Cal.4th 99, 150; and *People v. Coffman v. Marlow* (2004) 34 Cal.4th 1, 40.) Trial counsel correctly saw that there was no likelihood of a severance motion being granted and "trial counsel is not required to make frivolous or futile motions, or indulge in idle acts." (*People v. Reynolds* (2010) 181 Cal.App.4th 1402, 1409.)

Dkt. 12-4 at 2.

7

The Santa Clara County Superior Court's February 21, 2014 order denying petitioner's petition for writ of habeas corpus is the last reasoned decision from a state court on the ineffective assistance of counsel claims. *See* Dkt. 12-4. Therefore, that is the decision being examined through the deferential lens of 28 U.S.C. § 2254(d).

Petitioner's claim fails under the first prong of *Strickland* because he cannot show that defense counsel's decision not to move for severance fell below an objective standard of reasonableness. A lawyer need not file a motion that she knows to be meritless on the facts and the law. *See Wilson v. Henry*, 185 F.3d 986, 990 (9th Cir. 1999) ("to show prejudice under *Strickland* from failure to file a motion, [a petitioner] must show that (1) had his counsel filed the motion, it is reasonable that the trial court would have granted it as meritorious, and (2) had the motion been granted, it is reasonable that there would have been an outcome more favorable to him."). As the Santa Clara County Superior Court explained, "there was no likelihood" that a severance would be granted because "this was a 'classic case' for joinder." Dkt. 12-4 at 2. Trial counsel did not engage in deficient performance by not filing a meritless motion for severance. *See Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005); *Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996) (failure to take futile action can never be deficient performance).

Further, the record indicates that attorney for petitioner had made a tactical decision to present a joint defense strategy with the other codefendants, rather than seek separate trials. Respondent's Exhibit ("Resp't Exh.") B, RT 916-17. Petitioner was the only defendant with the alleged enhancements for personal use of a deadly weapon and personal infliction of great bodily injury, and was the only defendant charged with assault with a deadly weapon in count three, and thus was considered the most culpable of the three under the prosecution's theory of the case. Resp't Exh. A, CT 196-202. It was not deficient performance for his attorney to have pursued a joint defense because testimony from codefendants Martell and Samuel benefitted petitioner by painting a picture of him as coming to his friend Samuel's protection. Resp't Exh. B at 587, 644-45, 704, 741-42. The codefendants described Mauricio as the one commencing the physical aggression by spraying mace at them, thus provoking the fight between Samuel and Mauricio and subsequently prompting petitioner's involvement. *Id.* A difference of opinion as to trial tactics

1   does not constitute denial of effective assistance, *see United States v. Mayo*, 646 F.2d 369, 375
2   (9th Cir. 1981), and tactical decisions are not ineffective assistance simply because in retrospect
3   better tactics are known to have been available. *See Bashor v. Risley*, 730 F.2d 1228, 1241 (9th
4   Cir.), cert. denied, 469 U.S. 838 (1984). Federal courts should not overlook the "wide latitude
5   counsel must have in making tactical decisions"; therefore, there are no "strict rules" for counsel's
6   conduct "[b]eyond the general requirement of reasonableness." *Cullen v. Pinholster*, 131 S. Ct.
7   1388, 1406-07 (2011) ("'No particular set of detailed rules for counsel's conduct can satisfactorily
8   take account of the variety of circumstances faced by defense counsel or the range of legitimate
9   decisions . . . .'") (quoting *Strickland*, 466 U.S. at 688-89).

Petitioner also has not shown that defense counsel's decision not to move for severance was prejudicial to him, so his claim fails under the second prong of *Strickland*. Since the case was a "'classic case' for joinder" under state law, there is no reasonable likelihood the motion would have been granted. *See Wilson*, 185 F.3d at 990.

The Court concludes that petitioner has not shown that defense counsel was ineffective. His claims do not satisfy the deferential *Strickland* test: he has failed to establish that defense counsel engaged in deficient performance or that that he suffered prejudice as a result of the deficient performance. Given that petitioner fails to establish either element in *Strickland*, he cannot show the state court's rejection of his claim was an unreasonable application of *Strickland*.

### B.     Failure to Timely Move to Reopen.

Toward the end of the trial, codefendants Martell and, later, Samuel, chose to enter guilty pleas. *Saucedo*, 2011 WL 5356796, at *6-7. Petitioner's defense counsel then moved for a mistrial. *Id.* at *7. When the mistrial motion was not granted, she moved to reopen the case and for a two-week continuance because she needed more time to gather evidence. *Id.* at *8. These motions were denied. *Id.* The California Court of Appeal described at length the circumstances of the motion to reopen, although that court was not adjudicating an ineffective assistance of counsel claim:

> At the close of Samuel's case but before defendant's case, Martell

moved for a judgment of acquittal (§ 1118.1). The court granted the motion on count 1 [*i.e.,* the burglary charge]. It denied the motion on count 2 [*i.e.,* the assault with a deadly or dangerous weapon or by means of force likely to produce great bodily injury charge] and also denied Martell's motion to dismiss the case in the interest of justice (§ 1385). The court stated it was "prepared to make an offer" if Martell wished to enter a plea to count 2: "The Court would consider ... a grant of a Section 17, credit for time served, and it would be informal probation."

Later that same day, Martell accepted the court's offer. The court reduced count 2 from a felony to a misdemeanor (§ 17, subd. (b)(5)), and Martell pleaded no contest to misdemeanor assault. The court suspended imposition of sentence, granted him credit for time served, placed him on informal probation for one year, and ordered that he be "released forthwith."

Samuel also moved for a judgment of acquittal and for dismissal in the interest of justice. His motions were denied.

Defendant's counsel then brought up some "housekeeping" matters, asking the court to exclude photographs of defendant's tattoos and to "pare down" the number of prior felony convictions that would be admitted to impeach him. The court excluded the photographs as more prejudicial than probative but ruled that defendant could be asked whether his arms were covered with tattoos. The court also ruled that evidence of defendant's numerous prior convictions, including one for assault with a deadly weapon (a knife), two for burglary, one for forgery, and one for vehicle theft, would be admitted to impeach him if he were to testify. The court would also permit the district attorney to question defendant about a toxicology report that had come back positive for methamphetamine use.

When the jury returned to the courtroom, the court explained that the counts against Martell "no longer need to be decided in this case" and advised the jurors not to speculate about or consider why that was so.

Mauricio had earlier testified about his prior felony assault conviction, and the defense began its case by asking the court to take judicial notice of the court file reflecting that 1995 conviction. The court did so, and without offering further evidence or calling any witnesses, the defense rested. There was no rebuttal by the prosecution, and the jury was dismissed for the day.

That afternoon, Samuel accepted the prosecution's offer to plead no contest to assault by means of force likely to produce great bodily injury in return for dismissal of the burglary count and three years' probation with a maximum four-year sentence for a violation of probation. The jury was later told that "[t]he Court has already instructed you that ... there is one defendant in this case, that you are not to speculate in terms of what happened to the other two defendants. The fact that those defendants are not now present is not something for you to consider. You do, however, consider all of the evidence, which includes the testimony that was offered by those defendants."

10

Defendant moved for a mistrial that afternoon. His trial counsel explained that there had been "some indication" several days before that Martell and Samuel were entering into negotiations, "and then when we came back from ... lunch ..., there was an indication that ... discussions had broken down." "And the Court made clear that it was ... the People's right and the defendant's [sic] rights to enter into those negotiations at any time, and it was my indication informally that I was concerned about fairness to my client and due process to my client based upon what happened up to that moment, a joint defense effort. ... I cannot say that ... is the only reason that [defendant] did not take the stand in this case. I can say that [it] early impacted his decision to do that. And I will for the record list five things, five tactical decisions that were made jointly and were made with compromise in this case, and I will say on the record as an officer of this Court that those decisions would all have been different had I not entered into a joint defense agreement with codefendant Counsel. The first was opening the door ... regarding Mauricio['s] prior violent conduct.... [O]bviously there was a tactical issue in question for my client about whether to open that door, given his own 245 conviction.... Number two, the cross-examination of ... Martell by myself was severely curtailed as a courtesy to his attorney.... The third would be the cross-examination of [Samuel], which, again, was severely curtailed as a courtesy to his attorney and in an effort to enter compromise. The fourth would be my decision not to call Valerie ... as a witness.... Fifth-and I'll-you know, should the Court deny my mistrial motion, I'll obviously be making these points much more fully in a motion for a new trial. But also the-my decision not to pursue impeachment evidence regarding a defense witness who we interviewed was the apartment manager for the complex, who had several acts of, I guess, bad character or misconduct by Mauricio ... as a tenant. We did not call him as a witness, because he also had negative things to say about ... Martell. And in an effort to keep that door closed, and again as a compromise with Counsel, I did not call that witness to testify. These are the five things at this point that I can offer to the Court. Obviously, the first being the most important, in my view."

Responding to the mistrial motion the next morning, the district attorney argued that the decision to open the door to Mauricio's prior violent conduct was a tactical one "that ... does not rise to a denial of due process for [defendant]." She pointed out that Martell had entered his plea before defendant began his case, so the defense could have recalled him during its case-in-chief and thoroughly cross-examined him then. The defense could also have presented the apartment manager's testimony, since there was no longer any issue about showing Martell in a bad light. "There's no denial of due process rights when this is all evidence that could have been presented to a jury." The court denied the mistrial motion.

Raising the same issues, defendant's trial counsel then moved to reopen the case and for a two-week continuance (from January 12, 2010 to January 25, 2010) "to allow me to subpoena the appropriate witnesses and to ... pursue some issues that I was not able to pursue based on the joint defense agreements." Defendant's ability to argue third party culpability had been "hampered," his counsel contended,

11

>when Martell and Samuel suddenly "accepted culpability," and she needed "to fully explore the defense options that I set aside, or I need to consider whether there's been ineffective assistance of counsel. But either way, my client's facing 29 years, and he's entitled to a fair trial, and he's not getting one, in my view."
>
>The court denied the motions. "The fact that codefendants settle their cases during a trial is something that certainly does happen," the court explained. "The Court doesn't view it as something that is highly unusual." "For ... co-defense counsel not to advise their clients to accept settlement, if they view it in ... those specific clients' best interests, of course, is a conflict that Counsel can't have." "In other words, while the Court understands that there was a mutual understanding ..., certainly Counsel could not advise their clients that there might not be resolutions along the way.... Certainly, that is something that is foreseeable.... [I]t isn't possible for Counsel to state a hundred percent that there won't be conflicts amongst Counsel in terms of their visions ... of how the case should proceed."
>
>The jury was instructed the next morning, heard closing and rebuttal arguments, and began deliberating.

*Saucedo*, 2011 WL 5356796, at *6-8.

The Santa Clara County Superior Court rejected petitioner's habeas claim that counsel was ineffective in failing to timely move to reopen, finding that petitioner had not satisfied *Strickland*'s prejudice prong. Like the state appellate court had earlier concluded, the superior court concluded that the additional testimony would have been of negligible value. Dkt. 12-4 at 3. The superior court stated, "'the value of the evidence was slight.'" *Id.* Samuel's testimony "'would not have added anything to defendant's case.'" *Id.* The additional testimony from Martell "'would not have added anything of import to defendant's case either.'" *Id.* Valerie's testimony would not "'have added anything to defendant's case.'" *Id.* The superior court concluded that the evidence petitioner wanted to proffer "'was not material'" and "'the evidentiary value...was minimal.'" *Id.*[1]

Petitioner's claim fails under the second prong of *Strickland* because he has not shown that defense counsel's failure to timely move to reopen caused him prejudice. Even if the motion to reopen had been made in a timely fashion, petitioner has not shown that the trial court would have

---

[1] In reaching its decision on the limited value of the evidence, the superior court relied on the California Court of Appeal's analysis of the evidence. This court considers the state appellate court's reasoning, adopted by the superior court, to evaluate counsel's conduct in connection with the motion to reopen.

12

1  granted it, or that, had the motion been granted and the evidence been presented, that there is a
2  reasonable probability of a different outcome. *See Wilson*, 185 F.3d at 990; *Rupe*, 93 F.3d at
3  1445. The state court reasonably concluded that the additional testimony was of limited value due
4  its mostly cumulative nature. Any reputation evidence from the apartment manager to discredit
5  Martell would have been cumulative, because Martell already testified about his frequent loud
6  fights with Valerie and reported that neighbors complained to the apartment manager and police
7  about them, which led to their eventual eviction. *Saucedo*, 2011 WL 5356796, at *10. Any
8  testimony from the apartment manager to discredit Mauricio would have been cumulative because
9  Martell and Samuel already had described their problems with him and the jury had heard from
10 Mauricio. *Id.* Mauricio was considered such a "troublesome witness" that he discredited himself,
11 as the state appellate court noted. *Id.* Even the district attorney was compelled to comment during
12 closing argument that Mauricio was "not a terribly likeable person." *Id.* Regarding defense
13 counsel's plan to impeach Martell and Samuel because of a belated acceptance of responsibility,
14 Samuel already had admitted that he lied to the police and there was ample circumstantial
15 evidence to suggest that Martell had thrown the television on Mauricio. *Id.* at *10-11. Any
16 testimony from Valerie would not have added anything to petitioner's case because Samuel's and
17 Martell's credibility had already been impeached. *Id.*

18 The superior court's determination that this ineffective assistance of counsel claim failed
19 on *Strickland*'s prejudice prong was not an unreasonable application of *Strickland*. Petitioner is
20 not entitled to the writ on his claim that counsel was ineffective in failing to timely move to
21 reopen the case.

### C. The Unexhausted Failure-To-Investigate Claim.

Petitioner also asserted a claim in his first amended petition that counsel was ineffective in that she failed to investigate. Dkt. 13-1 at 26-27, 31. Counsel allegedly failed to (1) investigate and listen to jailhouse recordings of conversations between Martell, Samuel and Valerie, and (2) failed to interview Martell, Samuel and Valerie. *Id.* This claim will be denied as unexhausted and as meritless.

1.  Procedural History.

Petitioner included an ineffective assistance of counsel claim in his original petition. Dkt. 1-1 at 7. Respondent asserted in his answer filed on July 26, 2013 that petitioner had not exhausted state court remedies for his ineffective assistance of counsel claim. Dkt. 6-1 at 11-12. Petitioner thereafter conceded non-exhaustion and requested a stay of these proceedings to return to state court to exhaust the ineffective assistance of counsel claims, including a failure-to-investigate claim. *See* Dkt. 8 at 5-6. The Court granted a stay under *Rhines v. Weber*, 544 U.S. 269 (2005). Dkt. 11.

On September 22, 2014, petitioner filed a first amended petition in which he alleged, among other things, that counsel was ineffective in that she failed to investigate because she failed to listen to certain jailhouse recordings and failed to interview three witnesses (i.e., Valerie, Samuel and Martel). Dkt. 13-1 at 26-27, 31. On October 29, 2014, the Court granted petitioner's motion to lift the stay. Dkt. 14. Respondent filed an answer to the first amended petition on February 20, 2015, and argued that the claim that counsel was ineffective in failing to investigate should be rejected because state court remedies had not been exhausted for it. Dkt. 17-1 at 13. Petitioner filed his traverse on April 27, 2015. Dkt. 23.

Two weeks before he filed his traverse, petitioner filed a motion for discovery, seeking to obtain a copy of recorded jailhouse conversations that his attorney allegedly had failed to investigate. Dkt. 20. The existence of the recordings was not new information to petitioner, as he knew or should have known of the recordings since counsel had mentioned the records at the trial in January 2010 petitioner's presence.

The Court denied the discovery motion, finding that petitioner had not shown good cause for the requested discovery. Dkt. 31. Among other things, the Court determined that it was pure speculation that the contents of the jailhouse recordings would be of help to petitioner in proving his ineffective assistance of counsel claim. *Id.* at 3-4. (Petitioner had never heard the contents of the recordings and, in fact, contended that his attorney had not heard them either. Dkt. 13-1 at 26-27, 31.) The Court also determined that the ineffective assistance of counsel claim was

unexhausted, and relied on the fact of nonexhaustion to deny the discovery motion. Dkt. 31 at 4-5.

### 2. The Unexhausted Claim Is Denied.

The claim that counsel provided ineffective assistance of counsel in failing to investigate is unexhausted, but may be denied because it is not even colorable. *See* 28 U.S.C. § 2254(b); *Cassett v. Stewart*, 406 F.3d 614, 623–24 (9th Cir. 2005). Petitioner has failed to satisfy the prejudice prong of the *Strickland* analysis for his claim that counsel's alleged failure to investigate amounted to ineffective assistance of counsel. Petitioner does not know what evidence counsel would have unearthed had she investigated and is left to mere speculation that there was helpful information to be gained if counsel had listened to the recordings and interviewed the three witnesses. That sort of speculation is not sufficient to show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. The unexhausted claim that counsel was ineffective in failing to investigate is denied.

## II.  Right To Present A Defense Claim.

Petitioner claims that his constitutional right to present a defense was violated when the trial court denied his motion to reopen the case after his codefendants pled guilty at the end of the trial. Dkt. 13-1 at 38. This issue was rejected by the California Court of Appeal on direct appeal:

> "The decision to grant or deny a motion to reopen ... remains in the discretion of the trial court." (*People v. Monterroso* (2004) 34 Cal.4th 743, 779; § 1094.) "In determining whether a trial court has abused its discretion in denying a defense request to reopen, the reviewing court considers the following factors: '(1) the stage the proceedings had reached when the motion was made; (2) the defendant's diligence (or lack thereof) in presenting the new evidence; (3) the prospect that the jury would accord the new evidence undue emphasis; and (4) the significance of the evidence.' [Citation.]" (*People v. Jones* (2003) 30 Cal.4th 1084, 1110 (*Jones*).)
>
> Considering those factors here, we discern no abuse of discretion. The first factor supports the court's decision because although the motion to reopen was not by itself particularly untimely (*see Jones*, supra, 30 Cal.4th at p. 1111), it was coupled with an "attendant" motion for a two-week continuance that would have unduly prolonged the trial...Here, the trial had already run slightly longer

> than anticipated, which had caused one juror to express concern about missing the start of the school year, and jurors had also been told that they would be instructed and hear arguments of counsel that day.
>
> The second factor also supports the court's decision, because the reason proffered for the continuance—to permit the defense to "subpoena the appropriate witnesses" (i.e., Martell, Samuel, the apartment manager, Valerie, and "police officers to lay foundations and things like that")—evidences a lack of diligence. Since Martell entered his plea and was sentenced before defendant began his case-in-chief, defendant could have recalled him as a witness that same afternoon, as his trial counsel had to concede. (*People v. Funes* (1994) 23 Cal.App.4th 1506, 1520 [motion to reopen properly denied where the defense "could easily have introduced" the proffered evidence during cross-examination of the prosecution's witnesses or during the defense case.].) We are not persuaded by defendant's argument on appeal that it was not until Samuel also entered a no contest plea that the testimony of both codefendants became "critical" since both codefendants' "sudden departure" from the case was "highly suggestive of the conclusion that [defendant] ... wielded the knife." The argument assumes jurors would have speculated that Martell's and Samuel's departures "implied innocence on their part." Jurors might just as easily have speculated that the departures implied guilt, in our view, but they were properly instructed not to speculate at all about why Martell and Samuel were no longer in the case. We " 'must assume that jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given.' [Citation.]" (*People v. Richardson* (2008) 43 Cal.4th 959, 1028.)
>
> Defendant has also never satisfactorily explained why he had not previously served the apartment manager and Valerie with trial subpoenas to ensure their prompt appearances in the event his counsel decided to call them as witnesses. These were not newly discovered witnesses; the defense had previously interviewed the apartment manager, and as defendant concedes, both the manager's and Valerie's addresses were matters of public record. Had they been subpoenaed earlier, their testimony could have been presented during defendant's case-in-chief, particularly since there was no longer any reason to accommodate Martell's counsel's concern about the impact of their testimony on Martell's case. If the apartment manager's and Valerie's testimony was as "critical" as defendant now claims it was, we think he would have had both of them waiting in the wings. His failure to do so showed a lack of diligence.

*Saucedo*, 2011 WL 5356796, at *8-9.

With regard to the third factor mentioned in *People v. Jones*, 30 Cal. 4th at 1110 – the prospect that the jury would accord the evidence undue emphasis – the state appellate court stated that the jury may accord undue weight to the evidence because petitioner wanted to present it to

16

the jury after a two-week break in the trial. *Id.* at *10. The long gap, followed by presentation of the new evidence just before deliberations began, might lead the jury to give that new evidence undue emphasis. *Id.* With regard to the fourth factor mentioned in *Jones* – the evidence's significance – the state appellate court concluded that the value of the evidence was only slight. *Id.*

Whether grounded in the Sixth Amendment's guarantee of compulsory process or in the more general Fourteenth Amendment guarantee of due process, "the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (quoting *Crane v. Kentucky*, 476 U.S. 683 690 (1986)); *see California v. Trombetta*, 467 U.S. 479, 485 (1984) (due process); *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973) (compulsory process).

The constitutional right to present a complete defense includes the right to present evidence, including the testimony of witnesses. *See Washington v. Texas*, 388 U.S. 14, 19 (1967). But the right is only implicated when the evidence the defendant seeks to admit is "relevant and material, and . . . vital to the defense." *Id.* at 16. Additionally, a violation of the right to present a defense does not occur any time such evidence is excluded, but rather only when its exclusion is "arbitrary or disproportionate to the purposes [the exclusionary rule applied is] designed to serve." *Holmes*, 547 U.S. at 324 (internal citation and quotation marks omitted); *Michigan v. Lucas*, 500 U.S. 145, 151 (1991). "State and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." *Holmes*, 547 U.S. at 324 (2006) (quotations and citations omitted); see also *Montana v. Egelhoff*, 518 U.S. 37, 42 (1996) (holding that due process does not guarantee a defendant the right to present all relevant evidence). The exclusion of evidence does not violate the Due Process Clause unless "it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Egelhoff*, 518 U.S. at 42. The defendant, not the state, bears the burden to demonstrate this. *Id.* at 47 (internal quotations and citations omitted).

A violation of the right to present a defense merits habeas relief only if the error was likely to have had a substantial and injurious effect on the verdict. *See Lunbery v. Hornbeam*, 605 F.3d

754, 762 (9th Cir. 2010) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993)).

The state appellate court's reasoning amply supports its determination that the denial of petitioner's motion to reopen the case did not violate his constitutional right to present a defense. In sum, the California Court of Appeal rejected the claim that the case should have been reopened because reopening the case would have unduly prolonged the trial, the appropriate witnesses were available and could have been called before the defense rested its case, the jury might have accorded undue weight to the new witness testimony presented long after the other testimony, and the value of the new testimony was slight. *Id.* at *8-10. The state appellate court also discussed that the testimony that petitioner wanted to present from the apartment manager, Martell, and Valerie would have been cumulative. *Id.* at *10-11. Testimony from the apartment manager would have been cumulative because Martell already testified about his fights with Valerie, neighbors' complaints to the apartment manager and the police, and their later eviction. *Id.* at *10. Testimony about Mauricio would have been cumulative because both Martell and Samuel already had testified about their problems with Mauricio and Mauricio had discredited himself in various ways (e.g., he had a felony assault conviction, admitted that his statement to police about Martell punching and kicking him was merely an assumption, and was a poor witness.) *Id.* Regarding defense counsel's plan to impeach Martell and Samuel because of a belated acceptance of responsibility, Samuel already had admitted that he lied to the police and there was ample circumstantial evidence to suggest that Martell had thrown the television on Mauricio. *Id.* at *10-11. Any testimony from Valerie about the conversations she had with Samuel and Martell would not have added anything to petitioner's case because their credibility had already been impeached. *Id.*

Petitioner contends that the trial court should have granted his motion to reopen the case so he could have presented "critical defense evidence" that was "highly relevant" and "critical" to his defense. Dkt. 13-1 at 38-39. Petitioner also asserts that none of the evidence that he sought to introduce was marginally relevant or repetitive. *Id.* at 39-40. However, he does not show what that new evidence was, how it was relevant, or how it would make a difference in his favor. As to the evidence that was mentioned by counsel in her motion to reopen the case, the California Court

18

of Appeal determined that it was of slight or negligible value, as discussed above. Petitioner's mere disagreement with the California Court of Appeal's conclusion is not enough to show that the California Court of Appeal's rejection of the claim "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

The California Court of Appeal's rejection of petitioner's claim of a denial of a right to present a defense was not contrary to, or an unreasonable application of, clearly established federal law as set forth by the U.S. Supreme Court. Petitioner therefore is not entitled to the writ on this claim.

### III. A Certificate of Appealability Is Denied.

A certificate of appealability will not issue. Reasonable jurists would not "find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Petitioner may seek a certificate of appealability from the Court of Appeals.

### CONCLUSION

The state court's denial of petitioner's claims did not result in a decision that was contrary to, or an unreasonable application of, clearly established federal law, nor did it result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Accordingly, the petition for writ of habeas corpus is DENIED.

The Clerk shall enter judgment in favor of respondent and close the file.

**IT IS SO ORDERED.**

Dated: October 2, 2015

SUSAN ILLSTON
United States District Judge